IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

KRISTIN BORG, *et al.*,
    Plaintiffs,

    v.                                    Civil No. 3:21-cv-12 (DJN)

CHARLES WARREN *et al.*,
    Defendants.

## MEMORANDUM OPINION

Plaintiffs Kristin Borg ("Borg"), Jeannie Rich ("Rich"), John Denning IV ("Denning") and Katherine Collaros ("Collaros") (collectively, "Plaintiffs") bring this action against Defendants Charles D. Warren, Jr., ("Warren"), Jacob M. Dudek-Warren ("Dudek"), Bordeaux Farms, LLC ("Bordeaux Farms"), Charitable Occasion, LLC ("Charitable Occasion") and Marianne Warren ("Marianne" or "Ms. Warren") (collectively, "Defendants"), alleging violations of 18 U.S.C. § 1962(c) and (d) of the Racketeer Influenced and Corrupt Organization Act ("RICO"), Virginia Code § 59.1-196 *et seq.* (Virginia's Consumer Protection Act ("VCPA")), Florida Statute § 501.201 *et seq.* (Florida's Deceptive and Unfair Practices Act ("FDUTPA")), California Business and Professional Code § 17200 *et seq.* (California's Unfair Competition Law ("UCL")), North Dakota Century Code § 51-10-01 *et seq.* (North Dakota's Deceptive Trade Practice Law ("NDUTPL")) and Ohio Revised Code § 1345.01 *et seq.* and Ohio Administrative Code 109:4-3-01 *et seq.* (Ohio's Consumer Sales Practice Act ("OCSPA")), and asserting several state law claims including common law conspiracy, breach of contract, fraud and unjust enrichment.

This matter now comes before the Court on the Motion to Dismiss ("Warren-Dudek Mot." (ECF No. 11)) filed by Bordeaux Farms, Charitable Occasion, Dudek and Warren (collectively, the "Warren-Dudek Defendants"), and the Motion to Dismiss ("M. Warren Mot." (ECF No. 17)) filed by Marianne Warren[1]. For the following reasons, the Court hereby GRANTS IN PART AND DENIES IN PART the Motions to Dismiss filed by Defendants (ECF Nos. 11, 17). Specifically, the Court GRANTS Defendants' Motions as to Counts Four, Five, Seven, Ten and Eleven as to all parties. The Court DISMISSES WITH PREJUDICE Count Four, but DISMISSES WITHOUT PREJUDICE Counts Five, Seven, Ten and Eleven. Additionally, the Court GRANTS Defendants' Motion as to Counts One, Two and Three as to Defendants Charitable Occasion and Bordeaux Farms alone and DISMISSES WITHOUT PREJUDICE these claims as to these Defendants. Finally, the Court DENIES Defendants' Motion as to Counts One, Two and Three as to Defendants Warren, Dudek and Marianne Warren, as well as Counts Six, Eight and Nine as to all relevant Defendants.

## I.    BACKGROUND

### A.    Factual Background

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept as true the well-pled factual allegations set forth in Plaintiffs' Complaint (ECF No. 1). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Against that backdrop, the Court accepts the following facts as alleged for purposes of resolving the instant motion.

---

[1]    As Plaintiffs note, Marianne Warren filed her Motion to Dismiss on February 4, 2021, well after she filed an Answer (ECF No. 5) on December 21, 2020, therefore rendering her Motion to Dismiss procedurally barred. *See* Fed. R. Civ. P. 12(b) (requiring 12(b)(6) motions to dismiss to be filed "before pleading if a responsive pleading is allowed"). However, in the interests of judicial economy, the Court will address the merits of her Motion.

This case involves an allegedly decade-long criminal enterprise by Defendant Warren and various members of his family — including his mother Marianne Warren and Warren's then-boyfriend, now husband, Jacob Dudek — during which Warren schemed to sell untrained, ill-behaved dogs to "hundreds" of families around the country for tens of thousands of dollars while claiming that the dogs were actually highly trained service dogs. (Compl. ¶¶ 1-10.) This scheme began in October 2010, when Defendant Warren formed and incorporated a Virginia nonstock corporation, Service Dogs by Warren Retrievers, Inc. ("SDWR"). (Compl. ¶¶ 1, 26, 40.) Warren designated himself as President of SDWR and chairman of SDWR's Board of Directors. (Compl. ¶ 40.) Warren also appointed Dudek as Vice-President of SDWR. (Compl. ¶¶ 4, 57.)

According to Plaintiffs, Warren began his criminal scheme by setting up several single-member shell companies to help facilitate the scheme and ensure a mechanism by which Warren and Dudek could launder money out of SDWR that defrauded customers had paid to purchase a dog. (Compl. ¶ 6.) Specifically, in February 2011, Warren formed Bordeaux Farms, LLC, a single-member Virginia Limited Liability Company, for the purposes of purchasing and owning real property. (Compl. ¶ 43.) Warren subsequently purchased real property in Madison County, Virginia (the "Property") on which to conduct his business, and conveyed the Property to Bordeaux Farms for no consideration. (Compl. ¶¶ 6, 44-46.) Through Bordeaux Farms, Warren would lease the Property to SDWR for exorbitant rent. (Compl. ¶ 6.) The money would then flow through the companies directly into Warren's and Dudek's bank accounts. (Compl. ¶ 6.) Also, in May 2012, Warren formed Charitable Occasion, LLC, a single-member Virginia Limited Liability Company, which he also used to own real property and to hold and transfer funds laundered through SDWR and Bordeaux Farms. (Compl. ¶¶ 48-49.)

While Warren used some of the funds laundered through Bordeaux Farms and Charitable Occasion to help pay off the mortgage on the Property, he "wished to pay off the Mortgage faster." (Compl. ¶¶ 50-51.) So, Marianne Warren allegedly agreed to give her son "hundreds of thousands of dollars" to pay off the mortgage. (Compl. ¶ 52.) However, she only joined the scheme, because Warren "agreed to repay her (at a profit to her) with monies generated from the illicit activities he was engaged in through his operation of SDWR." (Compl. ¶ 53.) Thus, Marianne began to profit off of SDWR's scheme. (Compl. ¶ 54.) At various times over the ensuing years, Marianne provided additional funding to the scheme "with the expectation that she would make a profit when Dan Warren paid her back after defrauding consumers, such as the Plaintiffs." (Compl. ¶ 55.)

### i. The Diabetic Alert Dog Scheme

Beginning in late 2011 or early 2012, Warren began promoting a Diabetic Alert Dog Program, wherein he and Dudek represented to consumers that SDWR could provide them with specially trained service dogs that would alert when the dogs detected high or low blood sugar levels. (Compl. ¶ 60.) Warren and Dudek targeted a small number of families at the initiation of their scheme who could pay the full purchase price of a dog in one lump sum and to whom Warren and Dudek actually provided a highly trained dog to "give the fraud scheme the appearance of legitimacy." (Compl. ¶ 9.) They then had these families provide positive testimonials for SDWR's website to trick other families into believing that the organization was legitimate and that they would be treated the same. (Compl. ¶ 106.) In addition to representations made on the SDWR website, Warren and Dudek made various representations directly to consumers, including that the organization had "temperament tested" the dogs from a

young age, and that the dogs had received "special 'scent' training to 'achieve maximum alert and response ability.'" (Compl. ¶ 61.)

Plaintiffs Denning and Collaros represented two of the customers to whom Warren and Dudek made these representations. (Compl. ¶ 61.) Mr. Denning, a resident of Minot, North Dakota, contracted with SDWR for a diabetic alert service dog, but never received a dog. (Compl. ¶¶ 36-37.) Mr. Denning contacted Warren after he began to have issues with his diabetes while on site for his construction job. (Compl. ¶¶ 156-59.) Specifically, Mr. Denning told Warren that he needed a dog conditioned to loud noises and other distractions, as he would need the dog to function in oil field construction sites. (Compl. ¶ 161.) Warren assured Mr. Denning that for $25,000 SDWR would provide Mr. Denning with a dog that "would receive special training and would be fully trained to alert to blood sugar levels." (Compl. ¶¶ 162-63.) In fact, the dog "would be trained to fit John's specific needs and . . . Warren's trainers would use proprietary methods to customize training to suit John's needs — such as being able to function at a loud construction site around multiple distractions." (Compl. ¶¶ 162-63.) "[H]owever Warren knew none of this was true at the time he made these demonstrably false representations to John." (Compl. ¶ 162.)

Mr. Denning proceeded to make several payments to SDWR beginning in December 2019. (Compl. ¶¶ 165-66.) He mainly made these payments through "Donor Drive," a third-party vendor that facilitates charitable donations. (Compl. ¶¶ 108, 168.) At the end of every business day, these funds were automatically wired to bank accounts controlled by Dudek and Warren. (Compl. ¶¶ 114-15.) Warren and Dudek would then transfer the funds to either their own personal bank accounts, the bank accounts of Warren's shell companies or Ms. Warren's account in repayment for her investment in their scheme. (Compl. ¶ 115.)

From December 2019 to March 2020, Mr. Denning received several emails at Warren's or Dudek's direction, encouraging Mr. Denning to continue making payments towards the purchase price of the service dog. (Compl. ¶ 171.) In fact, Mr. Denning paid $16,000 towards his contract with SDWR before learning in May 2020 that SDWR had become insolvent and that he would not receive a dog. (Compl. ¶ 173.) According to Mr. Denning, he never received a dog, Defendants never had any intention of delivering a dog as promised and Warren has refused to return his money. (Compl. ¶¶ 175-76.)

Likewise, Ms. Collaros, a resident of Maineville, Ohio, contracted with SDWR for a diabetic alert service dog but also never received one. (Compl. ¶¶ 38-39.) The Collaros family contacted SDWR in early March 2018 after having issues regulating their child's blood sugar levels at night. (Compl. ¶ 177.) On a phone call between Warren and Ms. Collaros, Warren represented to her that the dog that her family contracted for would receive specialized training for her family's needs including training that "would enable the dog to get medical assistance such as by calling 911 by pushing a special button" and to "automatically alert to blood sugar levels—including, if necessary, arousing the Collaros[es] at night if their child's blood sugar levels dropped." (Compl. ¶¶ 180-81 (internal quotation marks omitted).)

The Collaros family executed a contract with SDWR on March 30, 2018, and Ms. Collaros began wiring payments to a Donor Drive account. (Compl. ¶¶ 186-88.) Ms. Collaros completed her final payment in December 2018. (Compl. ¶ 192.) At that time, SDWR communicated to her that it would take at least nine more months to receive her dog. (Compl. ¶ 193.) After nine months had elapsed, Ms. Collaros reached back out to SDWR to inquire about the status of the dog. (Compl. ¶ 196.) A staff member at SDWR told Ms. Collaros that "Warren informed [the staff member] that a dog, named 'Ben' had been selected for Ms. Collaros."

(Compl. ¶¶ 198-99.) Ms. Collaros received a picture of Ben, as well as a list of supplies to purchase before receiving the dog. (Compl. ¶¶ 198-99.) However, by January 2020, Ms. Collaros had still not received a delivery date for Ben, and staff members at SDWR gave her repeated excuses for the delay. (Compl. ¶¶ 202-03.)

In March 2020, SDWR told Ms. Collaros that all dog deliveries "had been suspended due to the COVID-19 pandemic." (Compl. ¶ 205.) Several weeks later, Ms. Collaros received an email, stating that she could actually pick up a dog in early April from the SDWR property at a "bonding event." (Compl. ¶ 206.) However, the email promised a dog named "Barkely," not "Ben." (Compl. ¶ 206.) Knowing the specialized training that SDWR had promised, Ms. Collaros began to suspect that SDWR and Warren had defrauded her. (Compl. ¶ 208.) She began asking additional questions about "Barkely" "such as how long the dog had been trained, [and] how 'Barkley' had been trained to alert as promised — and, no one, including Dan Warren, could answer those question." (Compl. ¶ 208.) Because of this, Ms. Collaros refused to pick up "Barkeley," noting that she had "paid $25,000.00 for a fully trained diabetic alert dog . . . not just a dog." (Compl. ¶ 209.)

Plaintiffs allege that Defendants made similar misrepresentations regarding their intent to deliver fully trained SDWR dogs to dozens of consumers. Yet, according to Plaintiffs, "[n]one of these claims were true and Warren and Dudek knew they were not true at the time they made such claims . . . ." (Compl. ¶ 62.) This was evinced by the fact that "many of the dogs that were actually provided to consumers were not even house broken, some exhibited aggressive behaviors, and some could not follow basic commands." (Compl. ¶ 64.) Yet, Denning, Collaros and numerous other consumers paid Warren "tens of thousands of dollars" based on Warren and

Dudek's representations, believing that they would receive a highly trained service dog. (Compl. ¶ 64.)

### ii. The Autism Therapy Dog Scheme

According to Plaintiffs, in 2016, Warren and Dudek decided to expand their service dog scheme and began targeting families with autistic children. (Compl. ¶ 67.) Warren began representing to consumers that he could provide them with dogs that had received training through a "proprietary training and placement program [that] ensures that every family with an Autism Dog finds the independence and safety they are looking for." (Compl. ¶ 68.) Specifically, Warren and Dudek made representations directly to consumers that their dogs could "[h]elp in 'finding a lost child,'" "[h]elp in 'redirection from self-harm'" and "[h]elp with Sensory Processing Disorder." (Compl. ¶ 69.)

Plaintiffs Borg and Rich represented two of the consumers who contracted with SDWR for an autism therapy dog. The Borg family contacted SDWR in early 2019, and over several months, Warren made numerous representations to them regarding the training of SDWR's dogs, including that the dog's training would be customized to the Borgs' needs. (Compl. ¶¶ 97-104.) As a result of these representations, "Mrs. Borg entered into a contract to purchase [a] Service Dog to help her autistic child for $25,000.00." (Compl. ¶ 105.) Between June 2019 and December 2019, Mrs. Borg wired numerous deposits from her bank account in Florida to her account on Donor Drive. (Compl. ¶¶ 108-09, 113.) Warren, through SDWR, had complete control over the third-party Donor Drive account. (Compl. ¶¶ 110-11.)

By December 2019, the Borg family had paid over $25,000 into the Donor Drive account, and Warren represented to the family that they would receive a "fully trained dog within 5-7 months." (Compl. ¶ 116.) However, on March 24, 2020, the Borg family received an email

about attending the "bonding opportunity" on April 8, 2020, provided that they could drive from Florida to Virginia on that day. (Compl. ¶ 119.) But, the email also stated that "they were *not* guaranteed to *keep* whatever dog they were provided with." (Compl. ¶ 119.) The Borgs realized after this email that Warren "might possibly be running a scam because, among other things, anyone familiar with autistic children and/or autism therapy dogs would never suggest providing an autistic child with a dog to 'bond' with despite the possibility that [the] dog would then be taken away." (Compl. ¶ 121.) The Borgs never received either their dog or the money that they paid to SDWR for the dog. (Compl. ¶ 123.) And, at the time that Dudek and Warren made the aforementioned representations, "they had no intention of ever providing [the Borgs] with a fully trained service dog." (Compl. ¶ 124.)

The Rich family also contacted Warren in late 2019 to ask about purchasing a dog for their autistic child. (Compl. ¶¶ 125-31.) Ms. Rich represented to Dudek and Warren that she could get a lump sum payment for the dog from her daughter's special needs trust. (Compl. ¶¶ 130-32.) At that time, SDWR was failing, so "Dudek and Warren — desperate for cash — immediately began making promises of how well [Ms. Rich] would be taken care of and how they could accelerate the delivery timeline." (Compl. ¶ 133.) Indeed, even though SDWR had represented on its website that delivery of a service dog would take 6-12 months, minimum, Warren told Ms. Rich that she could expect a dog "within a few months." (Compl. ¶¶ 129, 145.) Specifically, Warren and Dudek promised Ms. Rich that "she would receive a hypo allergenic dog named 'Abbot.'" (Compl. ¶ 138.)

However, on March 16, 2020, Ms. Rich received an email stating that SDWR had canceled all dog deliveries due to the pandemic, and Mrs. Rich could come to the April "bonding event" at the Property. (Compl. ¶ 146.) Ms. Rich repeatedly informed Warren (or an employee

at his direction) that she could not travel from her home in California to Virginia to pick up a dog and demanded that SDWR ship the dog to her as contracted. (Compl. ¶¶ 146-49.) In June, after several months of inadequate responses from Warren and his employees, Ms. Rich learned of SDWR's bankruptcy. (Compl. ¶ 151.) The Rich family never received a service dog from SDWR or the money that they had paid for the dog. (Compl. ¶ 152.) Moreover, "at the time Dudek and Warren made all of the aforementioned representations, they had no intention of ever providing Ms. Rich with a fully trained service dog. They just wanted her money." (Compl. ¶ 153.)

According to Plaintiffs, Defendants made similar misrepresentations to dozens of consumers. Yet, again, "many of the dogs that were actually provided to consumers were not even house broken, some exhibited aggressive behaviors, and some could not follow basic commands." (Compl. ¶ 74.) And, knowing that their representations were not true at the time that they made them, Warren and Dudek acted "with the willful and total disregard of how dangerous it would be for a family to rely on these representations, all of which make promises regarding the Autism Therapy Dog's ability to help keep a special needs child safe from harm." (Compl. ¶¶ 70-72.)

### iii.    End of Scheme

In 2018, Warren became the subject by an investigation and subsequent prosecution by the Attorney General's Office for the Commonwealth of Virginia. (Compl. ¶ 12.) As a result of this investigation and Defendants' depletion of SDWR's resources, SDWR began "spiraling toward insolvency." (Compl. ¶ 13.) Thus, beginning in late 2019, Warren and Dudek started shutting down SDWR after their schemes began to unravel financially. (Compl. ¶¶ 76-78.) Warren first listed SDWR's personal property for sale and deposited the proceeds from those

sales into his personal bank accounts. (Compl. ¶ 78.)  Warren also attempted to accelerate the

purchase process for SDWR's remaining dogs and for those customers who had already entered

into a contract with the company. (Compl. ¶¶ 79-80.)  Specifically, Warren induced customers

to accelerate their payments for the dogs in exchange for "matching grants" to receive as much

money has possible on these contracts within a short amount of time. (Compl. ¶ 79.)

As stated, Warren also organized a roadside dog pick-up event in April 2020, where he

attempted to dispose of as many dogs as he could to consumers who had at least partially paid

the $25,000 purchase price for a dog. (Compl. ¶ 80.)  Again, Warren transferred the money from

these sales to himself, his mother, Dudek and the LLCs that he had formed. (Compl. ¶ 81.)

In the spring of 2020, Warren listed the Property for sale. (Compl. ¶ 83.)  Then, in March

2020, Warren and Dudek allegedly traveled to Florida "to search for new property to buy with

the proceeds from the sale of the Farm and other assets." (Compl. ¶ 84.)  They did so with the

purpose of establishing a new service dog training program and to start a new scam in a different

state. (Compl. ¶ 86.)

On May 29, 2020, SDWR filed for Chapter 7 Bankruptcy in the United States

Bankruptcy Court for the Western District of Virginia. (Compl. ¶ 92.)

## B. Plaintiff's Complaint

On November 22, 2020, Plaintiffs filed a Complaint against Defendants, raising eleven

counts for relief based on the above allegations.  Counts One and Two allege violations of 18

U.S.C. § 1962(c) and (d) of the RICO Act by all Plaintiffs against all Defendants. (Compl.

¶¶ 231-36.)  Specifically, Plaintiffs contend that all Defendants conducted, participated and

conspired to participate in the conduct of a RICO enterprise through a pattern of racketeering

activity that has consisted of numerous and repeated violations of federal mail and wire fraud

statutes and that has resulted in injury to Plaintiffs' business or property interests. (Compl. ¶¶ 222, 236.) In Count Three, Plaintiffs allege a common law civil conspiracy claim against all Defendants based on Defendants' agreement to defraud Plaintiffs through their RICO enterprise. (Compl. ¶¶ 237-41.) Count Seven raises an unjust enrichment claim against all Defendants. (Compl. ¶¶ 267-72.)

Counts Four, Five, Six and Eight through Eleven are brought only against Defendants Warren and Dudek. Count Four alleges that Defendants Warren and Dudek violated the VCPA through the fraudulent misrepresentations that they made as both individuals and officers of SDWR. (Compl. ¶¶ 242-52.) Count Five raises a common law breach of contract claim, and Count Six raises a common law fraud claim. (Compl. ¶¶ 253-72.) Counts Eight through Eleven allege violations of various states' unfair and deceptive trade practices acts. (Compl. ¶¶ 273-334.)

C.      **Defendants' Motions to Dismiss**

In response to Plaintiffs' Complaint, on January 13, 2021, Warren, Dudek, Bordeaux Farms and Charitable Occasion filed a Motion to Dismiss (ECF No. 12), moving to dismiss Plaintiffs' Complaint for failure to state a claim under Rule 12(b)(6). In support of their Motion, the Warren-Dudek Defendants first argue that Plaintiffs lack standing to bring their claims, because (1) Plaintiffs never received a dog so they cannot claim that they received a *deficient* dog, or otherwise suffered any harm attributable to Defendants' misrepresentations about the dogs or their training and, (2) any claim that Defendants violated the law by laundering money out of SDWR constitutes property of SDWR's bankruptcy estate that the bankruptcy trustee has exclusive standing to bring pursuant to 11 U.S.C. § 541. (Mem. in Supp. of Mot. to Dismiss of Warren-Dudek Defs. ("Warren-Dudek Mem.") at 5-8.) They also contend that Count Three, the

common law conspiracy claim, must be dismissed for the same reasons — i.e. "Plaintiffs' conspiracy claims cannot be based upon inadequacies in the dogs or their training because they never received dogs[, and] Virginia law requires . . . a causal connection between the alleged conspiracy and the harm suffered." (Warren-Dudek Mem. at 9.)

As to Count Four, the Warren-Dudek Defendants argue that the Court should dismiss this claim because the VCPA only applies to "suppliers," and Warren and Dudek do not qualify as "suppliers" as defined by the Act. (Warren-Dudek Mem. at 9.) For Count Five, the Warren-Dudek Defendants argue that they do not have individual liability for SDWR's breach of contract (given that Warren and Dudek were not actually parties to the contract and never assumed any personal legal duties when executing it on SDWR's behalf), and that basic principles of corporate law provide limitation of liability to them as agents of a corporation. (Warren-Dudek Mem. at 10.) For Counts Six and Eight through Eleven, the Warren-Dudek Defendants again argue that Plaintiffs have failed to show a misrepresentation by Warren and Dudek that caused Plaintiffs any harm. (Warren-Dudek Mem. at 14-17.) Specifically, Plaintiffs never got a dog, so they can only speculate that they would have received a dog that did not meet the representations made by Warren and Dudek. (Warren-Dudek Mem. at 14-17.) Finally, as to the unjust enrichment claim, the Warren-Dudek Defendants argue that the cause of action is derivative of SDWR and therefore belongs to the bankruptcy estate, because any benefit conferred on Defendants by Plaintiffs would have resulted from the distribution of property by SDWR rather than any direct exchange between Defendants and Plaintiffs. (Warren-Dudek Mem. at 13.)

Marianne Warren filed a separate Motion to Dismiss (ECF No. 18) on February 4, 2021, adopting the arguments made in the Warren-Dudek Defendants' Motion as to Counts One, Two, Three and Seven, and adding several arguments of her own. Specifically, she contends that

13

Plaintiffs have not demonstrated that her advancement of funds to Warren proximately harmed Plaintiffs as the RICO statute requires. (Mem. in Supp. of Mot. to Dismiss of M. Warren ("M. Warren Mem.")) at 2-3.) She also appears to argue that Plaintiffs have not established a sufficient pattern of racketeering activity as to her. (M. Warren Mem. at 4-6.) As to the common law conspiracy claim, Ms. Warren claims that Plaintiffs have failed to allege either an unlawful purpose or concerted action, and that all actions taken by her "align with . . . normal familial self-interest and do not support an inference of concerted, illegal action." (M. Warren Mem. at 7-8.)

On February 18, 2021, Plaintiffs filed their Response in Opposition to both Defendants' Motions to Dismiss (Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Resp.") (ECF No. 25)). The Warren-Dudek Defendants filed their Reply on March 4, 2021, (Reply Mem. in Supp. of Warren-Dudek Defs.' Mot. to Dismiss ("Warren-Dudek Reply") (ECF No. 31)), and Marianne Warren filed her Reply on March 4, 2021, (Reply Mem. in Supp. of M. Warren's Mot. to Dismiss) ("M. Warren Reply") (ECF No. 32)), as well, rendering both Motions now ripe for review.

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

## III.   ANALYSIS

### A.   Count One: 1962(c) RICO Claim

Section 1964(c) of the RICO statute provides a civil remedy to individuals injured in their business or property interest by a violation of § 1962. 18 U.S.C. § 1964(c). In relevant part, § 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Pursuant to this statute, to succeed on a civil RICO claim, "a private RICO plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Field v. GMAC LLC*, 660 F. Supp. 2d 679, 686 (E.D. Va. 2008) (quoting *Sedima,*

*S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)). The RICO statute further clarifies that "racketeering activity" includes any act violative of several specific federal statutes, including 18 U.S.C. § 1341 and 18 U.S.C. § 1343, the federal mail and wire fraud statutes. 18 U.S.C. § 1961(1).

The plaintiff must then show that "(5) he was injured in his business or property (6) by reason of the RICO violations. The injury and causation components are viewed as standing requirements." *D'Addario v. Geller*, 264 F. Supp. 2d 367, 396 (E.D. Va. 2003). Thus, to determine whether a plaintiff has standing to bring a RICO claim, the Court must engage in "a traditional causation analysis." *Field*, 660 F. Supp. 2d at 686; *see also Walters v. McMahen*, 684 F.3d 435, 444 (4th Cir. 2012) ("[T]he RICO predicate acts must not only be a 'but for' cause of a plaintiff's injury, but the proximate cause of that injury as well.").

Defendants begin their Motions by attacking Plaintiffs' claims on standing grounds, arguing that Plaintiffs have not met these final two elements necessary to establish a private RICO claim. They contend that Plaintiffs have no standing to bring their RICO claims, because Plaintiffs suffered no injury as a result of any alleged RICO violations committed by Defendants. Specifically, they argue that Plaintiffs base their RICO claims on the predicate acts of racketeering involving (1) misrepresentations as to the quality of the dogs, and (2) improper siphoning of funds out of SDWR; yet, Plaintiffs never received a dog (and therefore cannot say that Defendants wrongfully induced them to pay for a dog that proved less trained than advertised), and any claim involving money taken out of SDWR "is property of its bankruptcy estate and the Chapter 7 trustee has exclusive standing to bring that claim." (Warren Mem. at 4.)

However, as explained below, Defendants predicate this standing argument on a basic misunderstanding of the fraudulent scheme that Plaintiffs allege as a basis for their RICO claims and the injury that they claim that they suffered as a result of this scheme.

**1.** **Plaintiffs Have Alleged an Adequate Injury to Their "Business or Property" by Reason of the Alleged RICO Violations of Warren and Dudek.**

**i.** **The Overarching Scheme to Defraud and Warren's and Dudek's Predicate Acts.**

Plaintiffs base their RICO claims on Defendants' "numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of an interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343." (Compl. ¶ 222.) The crimes of wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341 include two essential elements: (1) the existence of a scheme to defraud and (2) the use of wire communication or the mails in furtherance of that scheme. *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). To establish a "scheme to defraud," the plaintiff must show that the defendant acted with the specific intent to defraud. *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012) (citing *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001)). "And the element 'to defraud' has 'the common understanding of wronging one in his property rights by dishonest methods or schemes and usually signify[ing] the deprivation of something of value by trick, deceit, chicane, or overreaching.'" *Id.* at 477-78 (quoting *Carpenter v. United States*, 484 U.S. 19, 27 (1987)). "It is not necessary that use of mails or wire facilities be an essential element in the scheme." *Choimbol v. Fairfield Resorts*, 428 F. Supp. 2d 437, 443 (E.D. Va. 2006). Indeed, a plaintiff need only allege that the mailing or transmittal of information constituted "'step[s] in [the] plot,' and were incident to the essential part of the scheme." *Id.* at 444 (quoting *Badders v. United States*, 240 U.S. 391, 394 (1916)).

Additionally, when alleging fraud, a party must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), and "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This includes naming the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. . . [, facts] often referred to as the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotations and citations omitted). However, a plaintiff may generally allege conditions of an individual's mind, including "[m]alice, intent, [and] knowledge." Fed. R. Civ. P. 9(b).

According to Plaintiffs, over the course of nearly a decade, Warren and Dudek marketed and sold a product using the mails and wires that they never had any intention of providing to their customers. They used a series of promises and representations regarding the quality and availability of their product that they had no intention of fulfilling to induce consumers to enter into contracts and pay substantial consideration (indeed, tens of thousands of dollars) pursuant to those contracts. Then, Warren and Dudek did not provide the product. In sum, Defendants promised a (trained) dog, and Plaintiffs paid for a (trained) dog, but Defendants did not deliver a (trained or even untrained) dog. Thus, regardless of whether Plaintiffs in this case received a dog or not, they were victims of this scheme given their claims that Warren and Dudek wrongfully induced them to enter into and pay on a contract without Warren or Dudek ever intending to fulfill their end of the bargain.

The predicate acts of racketeering activity that Warren and Dudek allegedly performed include the false and misleading representations made over phone, text and email that SDWR could and would provide Plaintiffs with a "fully trained" service dog that Defendants would

18

"customize" to the individualized needs of the customer. And, in accordance with their pleading obligations under Rule 9(b), Plaintiffs specifically identify the content of those representations that constituted fraud, who made them, to whom they were made and when. For example, in paragraph 103 of the Complaint, Plaintiffs list specific promises made by Warren to Mrs. Borg on May 16, 2019, regarding the dog that SDWR would provide to her and her family. Plaintiffs state that Mrs. Borg entered the contract as a result of these representations. (Compl. ¶ 107.) The Complaint includes similarly particularized facts as to the Rich family (Compl. ¶¶ 137-44), Denning family (Compl. ¶¶ 160-65) and Collaros family (Compl. ¶¶ 181-85), identifying such specific promises as ensuring that a dog would be trained to "function at a loud construction site around multiple distractions" and to "get medical assistance such as by calling 911" by "pushing a special button"), and that the dogs would receive supplemental training (including in-home visits) once Plaintiffs received the dogs. (Compl. ¶¶ 103, 140-41, 162-63, 181.) According to Plaintiffs, Warren and Dudek "knew none of this was true at the time [they] made these demonstrably false representations" to them, never intended to fulfill these promises when they made them and "had no intention of ever providing [Plaintiffs] with a fully trained service dog." (Compl. ¶¶ 104, 124, 153, 162, 176, 212.) As stated, Plaintiffs need only plead Defendants' intent generally. Therefore, to the extent that Warren or Dudek might challenge the sufficiency of Plaintiffs' allegations under the heightened pleading standard for fraud, Plaintiffs have met their burden.

Furthermore, although Plaintiffs need not plead more than this general intent to meet their burden at this stage, they supply ample circumstantial evidence supporting their claim that Warren and Dudek had no intention of ever providing them with the bargained-for dog. Specifically, Defendants promised that "at the time of sale" the dogs purchased by Plaintiffs had

19

already "been evaluated" and "been determined . . . to be structurally and temperamentally suited to" fit the specific needs of the Plaintiffs. (Compl. ¶ 104.) In some instances, Warren and Dudek identified specific, named dogs that Plaintiffs would receive. (Compl. ¶ 138.) Yet, months later, Warren and Dudek invented numerous excuses as to why they could not complete their performance despite having already identified the dogs that Plaintiffs would receive. They even arranged the April bonding event in an attempt to sell to Plaintiffs *any dog they would take*. (Compl. ¶¶ 119-120, 138, 146-149.) This impersonal, generalized offloading of merchandise was certainly not what Plaintiffs contracted for, and the Court can reasonably infer that Warren and Dudek never had any intention of fulfilling the promises that they had made to convince Plaintiffs to enter into a contract.

Thus, in sum, Plaintiffs have adequately alleged a scheme to defraud and predicate acts by Warren and Dudek that involved lying to customers about the quality of dog that they would receive to induce the customers to enter into and pay on contracts that Defendants never intended to fulfill.

> **ii.      Plaintiffs' Injury and RICO Causation as They Relate to Warren and Dudek's Predicate Acts.**

Based on this conclusion, the Court also finds that Plaintiffs have alleged a clear and concrete financial loss as a result of Warren and Dudek's purported RICO violations. A "'showing of injury' [under the RICO statute] requires proof of concrete financial loss, and not mere injury to a valuable intangible property interest." *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994) (internal quotations omitted); *see also Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (citing *Steele* to state the same); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d Cir. 2008) ("A plaintiff asserting a claim under 18 U.S.C. § 1964(c) must allege *actual, quantifiable injury*.") (emphasis in original). Furthermore, the Supreme Court has stated that the

"by reason of" requirement mandates both proximate and but-for causation. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). Thus, the Complaint must allege "an adequate causal nexus between the injury and the alleged predicate acts of racketeering activity." *Hessek v. N. Am. Mortg. Ins. Servs.*, 2003 WL 23961817, at *4 (E.D. Va. Oct. 17, 2003). This requirement serves to "limit a person's responsibility for the consequences of that person's own acts." *Holmes*, 503 U.S. at 268.

The "proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct. That is ordinarily the case if the harm is purely derivative of 'misfortunes visited upon a third person by the defendant's acts.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (quoting *Holmes*, 503 U.S. at 268-69). So, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *Mid Atl. Telecom, Inc. v. Long Distance Serv., Inc.*, 18 F.3d 260, 263 (4th Cir. 1994) (noting that a RICO action cannot lie when the "causal connection" between the plaintiff's injuries and the RICO violation proves "too tenuous" and "ignore[s] the more immediate cause of" the plaintiff's injuries, or "the injuries were more appropriately attributable to intervening causes that were not predicate acts under RICO"). Thus, while a plaintiff need not establish this sort of causation to make out a predicate violation of the mail or wire fraud statute, such causation proves necessary to establish the RICO claim.

Plaintiffs contend that *as a direct result of the misrepresentations made by the Warren-Dudek Defendants to Plaintiffs*, Plaintiffs entered into contracts and *paid thousands of dollars to SDWR and Defendants*, believing that they would receive a highly trained dog as promised. (Compl. ¶¶ 105, 135-36, 142, 162-65, 184-87 ). *But for the representations made by Defendants*

regarding the quality of the training and the dogs, Plaintiffs would never have entered into a contract with SDWR or paid money for one of their service dogs. Yet, Plaintiffs never received the dogs that they had bargained for, which resulted in a concrete financial injury of thousands of dollars to each of them. That Plaintiffs would suffer financial harm is a direct and foreseeable result of Defendants' alleged scheme to use misrepresentations to induce them into entering and paying on a contract that Defendants never had the intention of fulfilling.

Defendants argue that because Plaintiffs concede that certain "High Value Families" actually received trained services dogs, Plaintiffs can only speculate that they would have received an untrained dog or that an injury would have resulted from Defendants allege misrepresentations regarding the quality of the dog had one been received. Yet, this argument again misses the point. Plaintiffs *have* been harmed by Defendants misrepresentations regarding the quality of dogs and their training, because Defendants' representations directly induced Plaintiffs to enter into a contract and pay thousands of dollars for a dog. Yet, according to Plaintiffs, Defendants never intended to fulfill these promises, and Plaintiffs never received a dog. Assuming that Plaintiffs can ultimately prove Defendants' intent at the time of sale, the Court fails to see how this does not amount to an injury proximately caused by the falsehoods regarding the quality of dogs communicated to Plaintiffs by Defendants.

> **2.    Plaintiffs Have Also Alleged an Adequate Injury to Their "Business or Property" by Reason of the Alleged RICO Violations of Marianne Warren.**

> **i.    Marianne Warren's Predicate Acts.**

As to Warren's mother, Marianne, Plaintiffs allege that she used the wires and mails to funnel money into Warren's and Dudek's criminal enterprise and fund the scheme to defraud. Specifically, they allege that Ms. Warren paid Warren "hundreds of thousands of dollars" in

2016 that Warren then used to pay off the mortgage on the Property. (Compl. ¶ 52.) At that time, "Ms. Warren was aware . . . that SDWR was unlawfully defrauding families of tens of thousands of dollars, but agreed to provide the loan payoff funds anyway, knowingly accept her son's ill-gotten gains, and join in his conspiracy to defraud vulnerable families." (Compl. ¶ 54.) Plaintiffs allege that this funding allowed Warren to diversify his fraud scheme and target new categories of families. (Compl. ¶ 67.)

Plaintiffs then contend that Ms. Warren invested $25,000 to $50,000 in early 2020 in an effort to keep Warren's business running. (Compl. ¶ 94.) Indeed, Plaintiff claims that "Ms. Warren's participation in the Warren RICO Enterprise is and was necessary for the operation of the enterprise's scheme to defraud, because (among other reasons) she, knowing that the purpose of the enterprise was to defraud consumers, funded the Warren RICO Enterprise by paying off loans that Dan Warren and other Co-conspirators owed to third parties and providing funds to sustain Warren's RICO Enterprise . . . ." (Compl. ¶ 219.)

Additionally, Plaintiffs have alleged that Ms. Warren committed these acts with the specific intent to defraud. *Wynn*, 684 F.3d at 478. Plaintiffs claim that Ms. Warren only started funneling money to her son based on her belief that she would receive profits from his illegal activity. Indeed, she invested in the company, believing that Warren's and Dudek's misrepresentations would be financially beneficial to her. While Ms. Warren contends that the Court should infer that she acted as a result of her familial duty as opposed to any illegal motive, the Court must make all reasonable inferences in favor of Plaintiffs at this stage.

Based on these facts, Plaintiffs have adequately alleged that Ms. Warren (1) used the wires or mails (2) in furtherance of the scheme to defraud already described. As stated, the use

23

of the wires or mails by the defendant need only constitute "steps in the plot," as Ms. Warren's active and regular funding of the RICO enterprise certainly qualifies.

### ii. Marianne Warren's "Pattern" of Racketeering Activity.

Ms. Warren alone appears to argue that Plaintiffs have not alleged that her conduct constituted a "pattern" of racketeering activity. (M. Warren Mem. at 4-6.) She further contends that the predicate acts ascribed to her have not been pled with the requisite specificity required by Rule 9(b). (M. Warren Mem. at 4-6.)

The RICO statute "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *US Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (internal quotations omitted). Thus, to show "a pattern of racketeering activity," a plaintiff must first allege "at least two acts of racketeering activity, one of which occurred after the effective date of [the RICO statute] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Additionally, the plaintiff "must show 'continuity plus relationship,' i.e., 'that the racketeering predicates are related, *and* that they amount to or pose a threat of continued activity.'" *AWAPPA*, 615 F.3d at 318 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

Acts prove related if they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (internal quotations omitted). The continuity requirement — "centrally a temporal concept" — ensures that only "long-term criminal conduct" will fall within the ambit of this statute. *Id.* at 242. The Supreme Court has further explained that the "continuity" requirement "is both a closed- and open-ended concept,

referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Thus, a plaintiff bringing a civil RICO claim must either demonstrate closed-ended continuity "by proving a series of related predicates extending over a substantial period of time" or open-ended continuity by proving that the defendant's prior acts threaten continued racketeering activity. *Id.* at 242.

Plaintiffs have alleged a series of predicate acts by Ms. Warren that plausibly establish a "pattern of racketeering activity." Plaintiffs allege that Ms. Warren began committing acts of wire fraud in furtherance of the scheme to defraud in 2016 when Ms. Warren sent her son hundreds of thousands of dollars with the intent that he would use it to pay off the mortgage on the Property (the locus of the scheme) and reinvest the money saved into the scheme, so that she could receive a portion of the profits. (Compl. ¶¶ 54-55.) Additionally, in early 2020, Ms. Warren invested a further $25,000 to $50,000 in the scheme. (Compl. ¶ 94.) She did so with the intention of keeping the scheme afloat. (Compl. ¶ 94.) According to Plaintiffs, these payments occurred at various times over the course of the four years that Ms. Warren allegedly participated in the scheme to defraud. The relatedness of these acts — i.e. these transfers all occurred to sustain and finance Warren's criminal enterprise — and their regular occurrence over a substantial period of time demonstrate the requisite close-ended continuity to establish a pattern of racketeering activity.

Importantly, Plaintiffs need not identify the exact who, what, when and where of each transfer made by Ms. Warren to meet the heightened pleading standard at this stage as, importantly, the "use of the mails need not in and of itself be fraudulent to constitute an offense" under the RICO statute, but must merely further the fraudulent, material misrepresentation relied upon by the plaintiff. *United States v. Murr*, 681 F.2d 246, 248 (4th Cir. 1982). Thus, this

district has found that "broad allegations" that defendants used the mails in furtherance of a scheme to defraud, coupled with a recitation of an "outline [of] the alleged scheme to defraud alleged scheme to defraud them of their home[,] . . . a time frame for the scheme, specific persons, entities, and times connected with the fraud, and the general contents of the alleged fraudulent communications" sufficient to meet the requirements of Rule 9(b), as it "put defendants on notice of the circumstances for which they will have to prepare a defense." *Williams v. Equity Holding Corp.*, 498 F. Supp. 2d 831, 842 (E.D. Va. 2007).

As already stated, Plaintiff has pled with requisite particularity the fraudulent misrepresentations made by the Warren-Dudek Defendants in furtherance of the parties' overarching "scheme to defraud." Specifically, Plaintiffs' have identified the specific fraudulent communications made by the Warren-Dudek Defendants, the consumers that they made them to, the contents of these communications and the nature of the alleged misrepresentations. And, Plaintiffs have alleged that Ms. Warren furthered these misrepresentations and the fund the scheme as a whole through her predicate acts of wiring money to Warren.

### iii. Plaintiffs' Injury and RICO Causation as They Relate to Marianne Warren's Predicate Acts.

Additionally, making all reasonable inferences in Plaintiffs' favor at this stage, the Court finds that the injuries suffered by Plaintiffs was a direct and foreseeable result of Ms. Warren's alleged RICO violations. From the Complaint, Ms. Warren's payments to Warren represented an integral part of the scheme itself, as these payments provided Warren, Dudek and SDWR with the necessary resources to accomplish their scheme. And, Plaintiffs' injuries did in fact result from the general goals and intended outcomes of this scheme as funded and sustained by Ms. Warren. Importantly, according to Plaintiffs, Ms. Warren acted with the belief that her financial support would further the scheme and result in the defrauding of consumers. Thus, Plaintiffs

26

essentially claim that Ms. Warren's financial support "sustained the enterprise, gave credence to the enterprise, and provided a financial shelter for the enterprise's activities." *Hanson v. First Nat'l Bank*, 2011 WL 13229375, at *5 (S.D.W.V. Aug. 1, 2011). In fact, "the enterprise is alleged to have been critically supported" by Ms. Warren's conduct. *Id.* In so framing the facts, Plaintiffs have alleged adequate RICO causation between their injuries and Ms. Warren's predicate acts.

### 3. *Plaintiffs Have Not Alleged an Adequate Injury to Their "Business or Property" Arising From Alleged RICO Violations By Bordeaux Farms and Charitable Occasion*

Unlike Warren, Dudek and Marianne Warren, Bordeaux Farms and Charitable Occasion only participated in the alleged RICO scheme by siphoning money out of SDWR. Plaintiffs' standing arguments thus find more traction here, given that Plaintiffs suffered no particularized, direct injury as a result of these actions committed by these shell companies in furtherance of the RICO scheme.

Pursuant to 11 U.S.C. § 541, all legal and equitable interests of the debtor, including causes of action, constitute property of the bankruptcy estate. 11 U.S.C. § 541(a)(1); *In re Anderson & Strudwick, Inc.*, 2015 WL 1651146, at *4 (E.D. Va. Apr. 8, 2015). While this statute establishes that federal law guides whether a debtor's interest constitutes "property of the estate," courts must look to state law to determine what specific causes of action or other rights constitute "interests" of the debtor and consequently property of the estate. *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 135 (4th Cir. 1988); *see also Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law."); *In re Lewis*, 137 F.3d 1280, 1283 (11th Cir. 1998) ("Readily apparent from the face of the statute, whether a debtor's interest constitutes "property of the estate" is a federal question. . . . [H]owever, the

nature and existence of the [debtor's] right to property is determined by looking at state law.")
(internal citations omitted).

Typically, a third party creditor may not bring claims based on rights "derivative of" the debtor, as they constitute property of the bankruptcy estate. *In re Health Diagnostic Lab., Inc.*, 2016 WL 6068812, at *7 n.17 (E.D. Va. Oct. 14, 2016) (citing *In re Bernard L. Madoff Inv. Secs. LLC*, 740 F.3d 81, 88 (2d Cir. 2014)). Additionally, in Virginia, a creditor may not bring alter ego claims, as under Virginia law, "a corporation has an equitable interest in the assets of an alter ego because the corporation and the alter ego are 'one and the same.'" *Steyr*, 852 F.2d at 136 (quoting *Pepper v. Dixie Splint Coal Co.*, 181 S.E. 406, 410 (Va. 1935)). Therefore, only "the trustee, who succeeds to the rights of the debtor, can bring [the] alter ego claim." *Id.* at 136; *see also In re Anderson*, 2015 WL 1651146, at *5 (citing *Steyr*, 852 F.2d at 135-36) (noting that, as a right of the debtor, the alter ego claim "passes into the bankruptcy estate and to the trustee"). Thus, if the Court concludes that "a cause of action is part of the estate of the bankrupt then the trustee alone has standing to bring that claim[,]" and not until the trustee has abandoned the action does the individual creditor gain standing to pursue it. *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.*, 187 F.3d 439, 441 (4th Cir. 1999).

Derivative claims constitute claims "which are 'based upon a secondary effect from harm done to the debtor,' and in the context of bankruptcy are 'ones that arise from harm done to the estate and that seek relief against third parties that pushed the debtor into bankruptcy.'" *In re Health Diagnostic Lab., Inc.*, 2016 WL 6068812, at *7 n.17 (quoting *Madoff*, 740 F.3d at 89 (internal quotation marks omitted)). Such generalized claims constitute property of the bankruptcy estate and "[are] properly pursued by the bankruptcy trustee because [they] inure[] to the benefit of all creditors. This promotes the orderly distribution of assets in bankruptcy, and

comports with 'the fundamental bankruptcy policy of equitable distribution to all creditors that should not be undermined by an individual creditor's claim.'" *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (quoting *Koch Ref. v. Farmers Union Cent. Exch., Inc.,* 831 F.2d 1339, 1344 (7th Cir. 1987)); *see also In re Anderson*, 2015 WL 1651146, at *8 (adopting reasoning in *Emoral* to find that trustee could assert successor liability claims, because the claim "is not specific to any one creditor and because any recovery would inure to the benefit of all creditors").

However, a plaintiff creditor *may* allege a direct cause of action against the alter ego or another third party that has misused the debtor's property that does not constitute property of the bankruptcy estate so long as the claim alleges a particularized injury to the plaintiff that is directly traceable to conduct by the third party rather than any harm resulting from the secondary effects of the injury by the third party to the debtor corporation. *See Emoral*, 740 F.3d at 879 ("[W]hen examining 'common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion,' where a claim is 'a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action.'") (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir.1989)); *In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012) ("[T]he touchstone for bankruptcy jurisdiction [over a non-debtors' claim] remains whether its outcome might have 'any conceivable effect' on the bankruptcy estate.'"); *Holcomb v. Pilot Freight Carriers, Inc.*, 120 B.R. 35, 42 (M.D.N.C. 1990) (citing *St. Paul Fire*, 884 F.2d at 704-05) (finding that individual creditor seeking to bring an alter ego claim himself must show that he "[was] injured by actions which can be directly traced to the alter ego's conduct as opposed to alleging harm

from the secondary effects of injury by [defendants] to [the company]."). "Put another way, 'when creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." *Madoff*, 740 F.3d at 89.

In light of this framework, any of Plaintiffs claims based on the misrepresentations made by Warren and Dudek directly to them and in furtherance of a scheme to defraud do not constitute alter ego claims assertable only by the bankruptcy trustee. The Complaint details particularized injuries arising from these representations that the Court can directly trace to Warren's and Dudek's conduct (and not a secondary injury to the company). While Marianne Warren may have wrongfully received payouts from SDWR that Plaintiffs would like to challenge, the basis of Plaintiffs' claims against Marianne Warren concern her funding and sustaining of the enterprise. As previously stated, these allegations establish a sufficiently direct, causal connection between Marianne's actions and Plaintiffs' injuries.

Conversely, the RICO claim against Bordeaux Farms and Charitable Occasion fails under this framework. As stated by Defendants, the basis for Plaintiffs' RICO claims against these entities "is solely limited to [their] receipt of money or property from SDWR," and the subsequent conveyance of this money to Warren, Dudek and Marianne. (Warren Mem. at 7.) Plaintiffs allege no actions or injuries to themselves that directly result from these companies laundering money out of SDWR, and their claims essentially amount to an attempt to challenge these transfers as fraudulent conveyances.

Virginia state law typically allows creditors the right to assert fraudulent conveyance claims. *In re SunSport, Inc.*, 260 B.R. 88, 111 (E.D. Va. 2000) (citing Va. Code § 55-80)). However:

> [a] typical fraudulent transfer claim is perhaps the paradigmatic example of a claim that is "general" to all creditors. . . . It is normally the debtor's creditors, and not the debtor itself, that have the right to assert a fraudulent transfer claim outside of bankruptcy, but in bankruptcy such a claim is usually brought by the trustee, for the benefit of all creditors. This is because the claim is really seeking to recover property of the estate.

*In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589 n.9 (5th Cir 2008); *see also Madoff,* 740 F.3d at 91 (citing *Seven Seas* to state the same); *In re Rescue Rangers, LLC*, 576 B.R. 521, 534 (E.D. Va. 2017) (stating that it had jurisdiction in bankruptcy over fraudulent transfer claims, because the "recovery of damages would affect the amount of property available for distribution to creditors, making these claims 'related to' the Debtor's bankruptcy estate").

While Plaintiffs do not style their RICO claim against Bordeaux and Charitable Occasions as a "fraudulent conveyance" claim, they need not do so for the Court to find that they lack standing to bring it. The Fourth Circuit considered a similar issue in *National American Insurance Company v. Ruppert Landscaping*, where two insurance companies brought claims for successor liability, tortious interference with contract and statutory and common law conspiracy in an effort to challenge the validity of an asset transfer between two companies, one of which had filed for bankruptcy. 187 F.3d at 440. The district court found that the insurance companies lacked standing to bring an action challenging the transfer, noting that the trustee had a potential fraudulent conveyance action to bring in the bankruptcy proceeding to challenge the legality of this transaction. *Id.* at 441.

The Fourth Circuit affirmed, noting that despite the labels for the parties' varying causes of action, they all "have the same focus . . . [and all] rely heavily on exposing the" contested transaction as fraudulent. *Id.* And, although the claims "do not contain identical elements, they all share this same underlying focus." *Id.* Thus, the court further reasoned that because the insurance companies' "causes of action [were] so similar in object and purpose to the claims that

31

the trustee could bring in bankruptcy court . . . the [insurance companies] lack[ed] standing to pursue these claims in district court." *Id.* Allowing the trustee to have "first crack" at challenging the transaction would ensure that the trustee could represent the interest of all creditors of the bankrupt company, given that "[a]ll creditors, not simply the [insurance companies], ha[d] a stake in exposing the impropriety" of the transaction. *Id.*

So too here, despite its label, Plaintiffs' RICO claim against the shell Defendants relies heavily on exposing the transfers made by these companies as fraudulent, and essentially amounts to a fraudulent conveyance claim. Thus, pursuant to the principle espoused by the Fourth Circuit in *Ruppert Landscaping* and by other circuits, SDWR's bankruptcy trustee has the superior interest in asserting a claim based on the improper siphoning of funds from SDWR against the shell entitles formed by Warren and Dudek than Plaintiffs. Such a claim proves generalized to all creditors of SDWR given that Plaintiffs only suffered secondary harm as a result of these allegedly unlawful distributions. Therefore claims based on these acts are derivative of the company, and Plaintiffs lack standing to bring them unless and until the trustee abandons them. For these reasons, the Court hereby GRANTS Defendants' Motion as to Charitable Occasion and Bordeaux Farms and DISMISSES WITHOUT PREJUDICE Count One as to these entities alone.

### B.    Count Two: § 1962(d) RICO Conspiracy Claim

Plaintiffs' RICO conspiracy claim survives for all Defendants except for Charitable Occasion and Bordeaux for similar reasons. Section 1962(d) extends liability to any person who conspires to violate any of the other subsections of the civil RICO statute. 18 U.S.C. § 1962(d). To satisfy § 1962(d), the plaintiff must establish two elements: (1) that two or more people agreed that some member of the conspiracy would commit at least two racketeering acts (i.e. a

substantive RICO offense) and, (2) that the defendant knew of and agreed to the overall objective of the RICO offense. *United States v. Cornell*, 780 F.3d 616, 623 (4th Cir. 2015); *Hengle v. Asner*, 433 F. Supp. 3d 825, 898 (E.D. Va. 2020). A plaintiff may prove such an agreement solely by circumstantial evidence. *Id.*

Plaintiffs have alleged facts sufficient to support the plausible inference that Warren, Dudek and Marianne Warren agreed to commit a substantive RICO offense. Indeed, as explained, Plaintiffs have alleged that these three Defendants each *did* commit a substantive RICO offense in furtherance of the same underlying scheme of defrauding customers out of tens of thousands of dollars — Marianne Warren regularly funneled money into the company using the mails and wires, believing that she would receive profits from the scheme, and Warren and Dudek made repeated misrepresentations to customers via the mails and wires to induce them into paying tens of thousands of unearned money to Warren, Dudek and SDWR.

Moreover, Plaintiffs allegations that Marianne Warren believed that she would receive profits from the scheme in exchange for her financial investment in her son's fraud make it reasonable to assume that the parties reached an agreement to commit these predicate acts. Finally, the regularity, consistency and relatedness of these Defendants alleged RICO violations, the interpersonal relationships of those who committed them and the personal benefits allegedly received by each of these Defendants from the accomplishment of their individual RICO violations further the conclusion that these Defendants conspired to accomplish the overarching scheme and its objective together.

Ms. Warren contends that the "Complaint is devoid of any factual basis for the conclusions that Mrs. Warren knew or should have known that any alleged illegal activity or purpose was undertaken by any person or entity connected to SDWR." (Compl. ¶ 6.) However,

Plaintiffs specifically allege that "as the business and the scheme grew, Dan Warren brought in his mother . . . to help fund and expand the business. Despite knowing SDWR was a scam, Ms. Warren knowingly provided hundreds of thousands of dollars in funding to help the business grow . . . ." (Compl. ¶ 8.) These allegations plausibly establish how Ms. Warren would have known about the illegal activity of SDWR, Warren and Dudek: by communicating with her son, the owner and primary operator of the company.

Although Ms. Warren urges the Court to make all reasonable inferences in *her* favor to conclude that she only acted as "an elderly Mother" attempting to "help her middle-aged son maintain gainful employment by advancing many thousands of dollars to him, rather than advancing funds to him to perpetrate a RICO fraud scheme," the Court must make all reasonable inferences in Plaintiffs' favor at this stage. (M. Warren Mem. at 5.) In so doing, it does not prove unreasonable to conclude that Warren would tell his mother about his illicit business dealings, especially given Plaintiffs' allegation that Ms. Warren then knowingly joined the scheme with the hopes of profiting from it.

However, little evidence exists in the Complaint that Bordeaux Farms and Charitable Occasion agreed to commit the predicate offenses perpetrated by Warren, Dudek and Marianne, aside from Plaintiffs' allegations that these entities wrongfully transferred money between SDWR and these Defendants. Thus, Plaintiffs' only theory of RICO conspiracy liability against these Defendants depends on showing that these conveyances were fraudulent. Therefore, because this claim is "so similar in object and purpose" to a claim that the trustee could bring against these entities in the bankruptcy proceeding, the Court concludes that Plaintiffs lack standing to pursue this claim.

For these reasons, the Court hereby DENIES Defendants' Motions as to Count Two as to

Warren, Dudek and Marianne Warren, but GRANTS Defendants' Motion as to Count Two as to

Bordeaux and Charitable Occasion and DISMISSES WITHOUT PREJUDICE Counts Two as to

these entities alone.

### C.     Count Three: Common Law Conspiracy Claim

Defendants likewise contend that the Court should dismiss Count Three of Plaintiffs'

Complaint for the same reasons that they offer as to Counts One and Two. Specifically, they

contend that Plaintiffs' "conspiracy claims cannot be based upon inadequacies in the dogs or

their training because they never received the dogs," and a cause of action for conspiracy

"predicated on the transfer of property out of SDWR is property of the SDWR bankruptcy estate

and cannot be asserted by Plaintiffs." (Warren Mem. at 8-9.) Ms. Warren separately contends

that Plaintiffs have failed to allege facts sufficient to establish either an unlawful purpose or

concerted action by Defendants. (M. Warren Mem. at 7.)

According to Virginia common law, "the elements of a common law civil conspiracy

claim are (i) an agreement between two or more persons (ii) to accomplish an unlawful purpose

or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff."

*Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007) (citing *Glass v. Glass*, 321 S.E.2d

69 (Va. 1984)). A plaintiff's allegations must establish that the defendants "combined together

to effect a 'preconceived plan and unity of design and purpose.'" *Bay Tobacco, LLC v. Bell*

*Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003) (quoting *Bull v.*

*Logetronics, Inc.*, 323 F. Supp. 115, 131 (E.D. Va. 1971)). However, "'mere conclusory

language' is insufficient to state a cause of action for civil conspiracy under Virginia law."

*Lewis v. Gupta*, 54 F. Supp. 2d 611, 618 (E.D. Va. 1999) (citing *Bowman v. State Bank of*

*Keysville*, 331 S.E.2d 797, 802 (Va. 1985)). Put differently, "Virginia requires a plaintiff to allege some details of time and place and the alleged effect of the conspiracy." *Firestone*, 485 F. Supp. 2d at 704 (internal quotations omitted).

For the same reasons that Counts One and Two of Plaintiffs' Complaint survive as to Defendants Warren, Dudek and Marianne Warren, but fail as to Charitable Occasion and Bordeaux Farms, so too does Count Three. As explained, Warren, Dudek and Ms. Warren each committed acts in furtherance of a scheme to defraud consumers out of thousands of dollars. Warren and Dudek made misrepresentations to consumers to induce them to enter into contracts and pay for a product that they had no intention of giving them. Plaintiffs provide a timeline of these misrepresentations as to each of them. Plaintiffs further allege details as to Ms. Warren's involvement, claiming that on several specific occasions she funneled money into SDWR with the purpose of furthering the criminal scheme established by Warren and Dudek. Plaintiffs clearly establish that Ms. Warren knew about the scheme due to communications with her son, Dan Warren, and that it was his promise of payments from the scheme's profits that induced Ms. Warren to participate.

Together, these facts form such a coherent and related pattern of actions that Plaintiffs have clearly established a unity of design and purpose by Warren, Dudek and Marianne from which the Court can further infer that the parties agreed to accomplish a common unlawful purpose. Moreover, as already discussed at length in prior sections, Plaintiffs have established that they suffered a concrete injury as a result of these Defendants' conspiracy. For these reasons, the Court hereby DENIES Defendants' Motion as to Count Three as to Defendants Warren, Dudek and Marianne Warren.

However, because the alleged evidence of Charitable Occasion's and Bordeaux Farms' participation in this conspiracy essentially amounts to Plaintiffs' claims that these shell companies fraudulently conveyed money between SDWR and Warren, Dudek and Marianne, the Court will DISMISS WITHOUT PREJUDICE these claims for lack of standing. Plaintiffs may reassert these claims if the bankruptcy trustee for SDWR later abandons them.

### D. Count Four: VCPA Claim

Defendants argue that Count Four of Plaintiffs' Complaint should also be dismissed because Plaintiffs' VCPA claim depends on Defendants' classification as "suppliers." (Warren Mem. at 9.) Yet, according to Defendants, Plaintiffs do not qualify as "suppliers" under the VCPA, because the Consumer Protection Act "has been consistently interpreted not to impose liability on a business' agents." (Warren Mem. at 9.)

To state a cause of action under the VCPA, a plaintiff must allege (1) fraud (2) by a supplier (3) in connection with a consumer transaction. *Brown v. Transurban USA, Inc.*, 144 F. Supp. 3d 809, 845 (E.D. Va. 2015). A plaintiff must further show that "they reasonably relied to their detriment on some promise or misrepresentation made by Defendants." *Id.* (internal quotations and alterations omitted). As defined by the VCPA, a "consumer transaction" constitutes the "advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes." Va. Code. § 59.1-198. Additionally, a "supplier" constitutes "a seller . . . who advertises, solicits, or engages in consumer transactions . . . ." *Id.*

Consistent with Defendants' argument, court applying Virginia law have found that mere "agents" of a company do not qualify as a "supplier" under the VCPA. *See Branin v. TMC Enterprises, LLC*, 832 F. Supp. 2d 646, 650-51 (W.D. Va. 2011) (declining to extend

applicability of VCPA to an office manager employee of organization, because she merely "facilitated" the transaction); *Cherdak v. McKirdy*, 2017 WL 11501875, at *4 (E.D. Va. Aug. 15, 2017) (finding that majority shareholder and president of company did not qualify has "supplier" under the VCPA); *Bondurant v. Marscheider Props., LLC*, 2016 WL 11575155, at *3 (Va. Cir. Ct. Sept. 30, 2016) ("The unambiguous language of the statute defines the supplier as the seller. In this transaction, the Property was sold by the LLC, not [the defendant owner of the LLC]. As an agent of the seller, the statute imposes no personal liability on [the defendant owner of LLC].").

Plaintiff counters that "[u]nder Virginia law, individual liability can be imposed on a corporate officer, director, or agent when he or she personally conducts the corporation's affairs in an illegal, criminal manner." *Branin*, 832 F. Supp. 2d at 651. Therefore, Plaintiffs should be able to assert individual claims against Dudek and Warren for violations of the VCPA. (Warren Mem. at 30-31.) Consistent with this argument, in *Stitt v. Nautilus Enterprises, Inc.*, a Virginia Circuit Court found that an officer or agent of a corporation could be held personally liable for VCPA violations committed by the corporation in which the officer or agent directly participated. 1989 WL 646248, at *2 (Va. Cir. Ct. Apr. 25, 1989). The court explained that a "contrary rule 'would in many instances afford immunity to the chief offenders, the officers of the corporation, without whose assistance it would be impossible for the corporation to engage in the prohibited business.'" *Id.* (quoting *Crall v. Commonwealth*, 49 S.E. 638, 640 (Va. 1905)).

However, the Court declines to follow this approach. The plain language of the VCPA defines the "supplier" as the seller. As the mere agents of SDWR, neither Dudek nor Warren constituted the seller of the service dogs. This conclusion comports with the more recent case law wherein courts applying Virginia law have declined to expand the applicability of the VCPA

38

beyond that specifically prescribed by the Virginia legislature. *See Branin*, 832 F. Supp. 2d at

651 (citing *Greenburg v. Commonwealth*, 499 S.E.2d 266, 270 (Va. 1998) (concluding that the

plain and unambiguous language of the VCPA limits the scope of the liability that it imposes).

Therefore, the Court follows the reasoning of these courts and likewise concludes that Plaintiffs

cannot hold Warren and Dudek liable as "suppliers" within the meaning of the VCPA. For these

reasons, the Court hereby DISMISSES WITH PREJUDICE Plaintiffs' VCPA claims against

Warren and Dudek.

### E.    Count Five: Breach of Contract Claim (Against Warren and Dudek)

As to Plaintiffs' breach of contract claim, Defendants contend that Plaintiffs cannot hold

them liable for any contractual breach due to a lack of privity between themselves and Plaintiffs.

(Warren Mem. at 10.) Specifically, they contend that Plaintiffs cannot hold them personally

liable as officers of SDWR, because of the distinction that the law seeks to uphold between a

corporation as a legal entity and those shareholders and officers that own and work for the

corporation. (Warren Mem. at 10.) Defendants maintain that Plaintiffs must seek relief for this

cause of action through the bankruptcy proceedings for SDWR itself. (Warren Mem. at 10.)

Plaintiffs again counter with their argument that under Virginia law, "officers of a corporate

entity can be held liable for their unlawful acts *as officers of the entity*," and therefore Dudek and

Warren should be liable for participating in and directing unlawful acts in breach of the contracts

with Plaintiffs. (Pls.' Resp. at 32 (emphasis in original).)

Ordinarily, the legal interests established by a contract vest solely in the promisee and

promisor, rendering only these parties liable for the legal interests, duties and obligations

promised by the contract. *Cottrell v. Gen. Sys. Software Corp.*, 448 S.E.2d 421, 422 (Va. 1994).

Thus, the promisor, promisee "or their privies are generally the only persons who can sue on the

contract." *Id.* (internal quotations omitted). When a corporation enters into a contract through an officer or director, only the corporation becomes liable for the legal duties prescribed by the contract, as long as the officer constitutes "an identified agent" and "'the agent makes a full disclosure of the fact of his agency, and the name of his principal, and contracts only as the agent of the named principal . . . .'" *SettlementRoom L.C. v. Certified Env'ts, Inc.*, 2005 WL 832215, at *2 (Va. Cir. Ct. 2005) (quoting *Richmond U.P.R. Co. v. New York S.B.R. Co.*, 28 S.E. 573 (1897)); *see also Flood Doctor, Inc. v. Winters*, 2016 WL 5328098, at *1 (Va. Cir. Ct. 2016) ("Virginia follows the general rule that an agent for a disclosed principal is not personally liable for any alleged breach of contract of his principal.") (citing *Lambert v. Phillips & Son*, 64 S.E. 945, 946 (Va. 1906)).

This limitation on liability aligns with general principles of limited liability in corporations law. Certainly, "the proposition is elementary that a corporation is a legal entity separate and distinct from the stockholders or members who compose it." *Cheatle v. Rudd's Swimming Pool Supply Co., Inc.*, 360 S.E. 2d 828, 831 (Va. 1987). Thus, "it is also axiomatic that when a corporation causes injury as a result of an unlawful action, it is the corporation that is directly liable for any judgment obtained against it by the injured party." *Dana v. 313 Freemason*, 587 S.E.2d 548, 553 (Va. 2003). Ordinarily, this narrowly limits personal liability of directors and officers for corporate debts. *Bank of America v. Musselman*, 222 F. Supp. 2d 792, 797 (E.D. Va. 2002). Indeed, "only in extraordinary circumstances are directors liable for corporate debts . . . [as t]here is a strong public policy of shielding directors from individual liability for corporate debt." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 534 (4th Cir. 1988). However, piercing the corporate veil and imposing alter ego liability constitutes one such circumstance in which directors might assume personal liability for corporate debts.

Pursuant to these principles, Warren and Dudek have no personal liability for SDWR's contracts with Plaintiffs. Although Warren and Dudek may have executed the contracts on SDWR's behalf, it appears that all of the Plaintiffs knew that they were actually contracting with SDWR. The Complaint gives no indication that Warren and Dudek constituted parties to these contracts separate and distinct from SDWR itself, or otherwise assumed any duties or obligations to Plaintiffs under these contracts that would render them personally liable for a contractual breach. Therefore, privity and the consequent right to enforce or sue upon breach only existed between SDWR, the corporate entity, and Plaintiffs.

However, Plaintiffs claim that Warren and Dudek are liable for the breaches of the contracts by SDWR based on the principle that "[u]nder Virginia law, individual liability can be imposed on a corporate officer, director, or employee when he or she personally conducts the corporation's affairs in an illegal manner." *Tsimpedes v. Martin*, 2006 WL 2222393, at *2 (E.D. Va. Aug. 2, 2006). Indeed, it proves clearly established that an "officer cannot avoid criminal responsibility for an illegal act on the ground that it was done in his official capacity or through the instrumentality of the corporation which he controls and dominates and which he has employed for that purpose." *Bourgeois*, 227 S.E.2d at 718. Furthermore, where "the business itself involves a violation of the law all who participate in [the violation] are liable." *Id.* And, as Plaintiffs note, this principle "applies in both the criminal and civil contexts." *Tsimpedes*, 2006 WL 2222393, at *2.

But, contrary to Plaintiffs' assertions, this principle does not extend to Plaintiffs' breach of contract claim. While the Virginia Supreme Court has recognized that an officer of a corporation *does* assume personal liability for his own negligence, based on the principle that "an agent has a *tort* liability for injuries to a third party resulting from the agent's negligent act while

acting within the scope of his employment by his principal," the officer "is not liable for breach of [the corporation]'s contract with" a third party, even if the breach flows from the negligent performance of the contract by the officer. *Miller v. Quarles*, 410 S.E.2d 639, 641 (Va. 1991).

Consistent with this principle and applying Virginia law, the Fourth Circuit has upheld a finding that "corporate officers would not be liable for a corporate contractual obligation" although they "directly engaged in the transaction" and committed fraudulent acts that in part led to the breach. *Sit-Set, A.G. v. Universal Jet Exch., Inc.*, 747 F.2d 921, 929 (4th Cir. 1984). However, the court acknowledged that "officers may of course be liable jointly and severally with their corporation for obligations arising out of *tortious* conduct of the officers that subject the corporation to liability." *Id.* (emphasis added). Thus, while the officers here are liable for their personally tortious and illegal conduct that may have *caused* the company to breach its contract with Plaintiffs, they are not necessarily liable for the breach itself. *See In re Ellison*, 296 F.3d 266, 271 (4th Cir. 2002) ("And while an officer of a corporation is in no way personally liable for corporate torts solely on account of his corporate position, where the officer actually participates in or otherwise sanctions the tortious acts, personal liability may lie.").

The cases cited by Plaintiffs do not contradict this holding, as they involve an officer's commission of either a criminal act or a tort. *Bourgeois*, 227 S.E.2d at 718 (considering grand larceny conviction); *Tsimpedes*, 2006 WL 2222393, at *2 (considering defamation and intentional interference with business expectancies claims). Indeed, Plaintiffs do not provide a case — nor can the Court independently perceive one — in which a court applying Virginia law has applied this principle to hold an officer or director liable for a corporate contract to which the officer did not represent a party. As Defendants correctly note, tort law importantly "involves principles such as vicarious liability and *respondeat superior* under which both agent and

42

princip[al] can be held liable for the same tortious conduct . . . Breach of contract has no such analogous principles and privity of contract is required to maintain an action." (Warren Reply at 9.)

Thus, contrary to Plaintiffs' urging, the principle that Plaintiffs cite does not act as a mechanism by which parties can overcome the contractual privity requirement to hold officers or directors liable for a company's contractual breach, but rather acts as a mechanism by which an officer or director can be found personally liable for their own bad acts that might have *led to* or *contributed* to the corporation's breach. And, as described below, Plaintiffs can hold Warren and Dudek independently and personally liable for the fraudulent acts that they committed that *caused* SDWR to breach their contracts, but Warren and Dudek have no personal liability for the contractual breach itself.

To the extent that Plaintiffs seek to recover for their breach of contract claim from Warren and Dudek based on an alter ego theory of liability, they also may not do so as, for reasons previously stated, this alter ego claim must go through the bankruptcy estate. In *Fidelity National Title Insurance Company of New York v. Bozzuto*, a title insurance company attempted to assert a breach of contract claim against a shareholder, officer and director of one of its corporate agents, based on the theory that "because [the corporate agent] was merely [the officer's] instrumentality, [the officer] was in effect a party to the contract and [was] thus liable for [the corporate agent]'s breaches." 227 B.R. 466, 471 n.8 (E.D. Va. 1998). The court found that under *Steyr-Daimler*, this claim constituted property of the corporate agent debtor given that the title company's action sought "to hold [a] third part[y] liable for a corporation's contractual debts on an alter ego theory," and *Steyr-Daimler* "holds that under Virginia law, alter ego claims are the property of the debtor, and hence may be brought by the bankruptcy trustee pursuant to

11 U.S.C. § 541." *Id.* at 471. The court distinguished this breach of contract claim from the other breach of contract claims asserted against the officer, noting that the other claims alleged breaches of duties owed "directly, not derivatively." *Id.* at 472. Specifically, these breaches were "based on [the officer]'s separate contract with [the title company], a contract that imposed obligations on [the officer] separate and distinct from any obligations of [the corporate agent] to [the title company]." *Id.*

Thus, to the extent that Plaintiffs attempt to hold Warren and Dudek liable for SDWR's contractual breach based on the theory that SDWR was merely Warren and Dudek's instrumentality and they were actually in effect parties to the contract, this process must involve SDWR's bankruptcy estate. For these reasons, the Court hereby GRANTS Defendants' Motion as to Count Five, and DISMISSES WITHOUT PREJUDICE Count Five of Plaintiffs' Complaint.

**F.    Count Six: Fraud Claim**

Warren and Dudek also maintain that Plaintiffs' common law fraud claim should be dismissed, because Plaintiffs base their fraud claims on mere unfulfilled promises regarding the quality of dogs that they would receive, rather than any misrepresentations regarding a fact that existed when Plaintiffs entered into their contracts with SDWR. (Warren Mem. at 11.) Furthermore, Defendants renew their previous argument that Plaintiffs cannot claim that they suffered harm as a result of any alleged misrepresentations regarding the skill and training of SDWR dogs, because they never received a dog and, therefore, never had the opportunity to assess the adequacy of the dogs. (Warren Mem. at 11.) According to Defendants, Plaintiffs have not adequately alleged that Defendants made any intentionally false statements that Plaintiffs then relied on to their detriment. (Warren Mem. at 11-12.)

44

A common law fraud claim requires a plaintiff to allege "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party mislead and, (6) resulting damage to the party mislead." *State Farm Mut. Auto. Ins. Co. v. Remley*, 618 S.E.2d 316, 321 (Va. 2005) (internal quotations omitted). When alleging a fraud claim, a party must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), and "state with particularity the circumstances constituting fraud or mistake." However, a plaintiff may generally allege conditions of an individual's mind, including "[m]alice, intent, [and] knowledge." Fed. R. Civ. P. 9(b). Importantly, "[f]raud claims 'must relate to a present or a pre-existing fact, and cannot be predicated on unfulfilled promises or statements as to future events.'" *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 876 F. Supp. 2d 672, 681 (E.D. Va. 2012) (quoting *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 454 (E.D. Va. 2009)). This rule exists because a "mere promise to perform an act in the future is not, in a legal sense, a representation, and a failure to perform it does not change its character." *Enomoto*, 624 F. Supp. 2d at 454. Otherwise, every breach of contract claim could also qualify as a fraud claim. *Blair Constr. Inc. v. Weatherford*, 485 S.E.2d 137, 139 (Va. 1997).

However, an exception to this general principle exists when a defendant makes a promise that "when made, he has no intention of performing, in which case 'th[e] promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud.'" *Cyberlock Consulting*, 876 F. Supp. 2d at 681 (quoting *Station #2, LLC v. Lynch*, 695 S.E.2d 537, 540 (Va. 2010)). Thus, a plaintiff must allege a "contemporaneous intent" not to perform on the promise at the time that he made the promise. *Station #2*, 695 S.E.2d at 540. "'[T]he promisor's intention — his state of mind — is a matter of fact. When he makes the promise, intending not to perform, his promise is a misrepresentation of *present* fact, and if made to induce the promisee to

act to his detriment, is actionable as an actual fraud.'" *Flip Mortg*, 841 F.2d at 537 (quoting

*Colonial Ford Truck Sales v. Schneider*, 325 S.E.2d 91, 94 (Va. 1985)); *see also Boykin v.*

*Hermitage Realty*, 360 S.E.2d 177, 178-79 (Va. 1987) (internal quotations omitted) ("[The] gist

of fraud in such [a] case is not the breach of the agreement to perform, but the fraudulent intent .

. . [T]he fraudulent purposes of the promisor and his false representation of an existing intention

to perform . . . is the misrepresentation of a fact.").

Here, Plaintiffs have plausibly alleged that the fraud perpetrated by Warren and Dudek

constituted their contemporaneous intent not to perform on the promise to provide Plaintiffs with

highly trained service dogs at the time that they made these promises. Plaintiffs claim that

Defendants knew that their representations concerning the quality and training of the dogs that

Plaintiffs would receive were untrue at the time that Warren and Dudek made them. They

further claim that Warren and Dudek made these representations with the intent to deceive. And

Plaintiffs clearly relied on these representations as evinced by their willingness to enter into

contracts and pay thousands of dollars for a dog.

While Plaintiffs need not plead more than Warren and Dudek's general intent[2] at this

stage, the circumstantial evidence alleged by Plaintiffs lends further support to this theory of

liability and bolsters the plausibility of Plaintiffs' claims. According to Plaintiffs, Defendants

gave dozens of families untrained service dogs over a period of ten years. Plaintiffs were

repeatedly fed various falsehoods throughout their payment periods including time frames for

---

[2]     Again, this standard for alleging Defendants' intent or state of mind should not be
mistaken with the pleading standard for alleging the *circumstances* constituting fraud, which
requires that Plaintiffs "state with particularity the circumstances constituting fraud or mistake."
Fed. R. Civ. P. 9(b).  However, Plaintiffs have likewise met this standard as well, given that they
have identified and detailed the specific communications made by Warren and Dudek in which
Warren and Dudek perpetrated their fraud.

delivery that never came true and promises that Plaintiffs would receive specific, named dogs when these dogs never actually appeared to be available. Additionally, the fact that Defendants tried to unload *any* dog that they could on Plaintiffs at the April bonding event months (to years) after Plaintiffs had first entered into a contract for a dog (and training of those dogs had presumably needed to begin) strongly suggests that Warren and Dudek had never actually initiated any training or ever intended to complete this training.

Together, these allegations support the inference that SDWR never had the infrastructure in place to deliver on Warren and Dudek's promises from the moment that they were made, much less that Warren and Dudek ever had any intention of fulfilling these promises. The mere fact that Warren and Dudek singled out a few families early on in their scheme to bolster their company's reputation does little to overcome the weight of these allegations, especially because Plaintiffs do not necessarily fit the profile described in the Complaint for those families that Defendants targeted to be the "High Value Families."

Finally, the Court will not address Defendants' arguments regarding damage causation in depth, given its previous discussion of this issue. But, in sum, Defendants again attempt to mischaracterize the nature of Plaintiffs' damages. Plaintiffs were injured by the fact that they relied on Warren's and Dudek's misrepresentations, paying thousands of dollars on a contract that Warren and Dudek never had any intention of fulfilling. Whether or not Plaintiffs actually received a dog proves irrelevant. For these reasons, the Court hereby DENIES Defendants' Motion as to Count Six.

### G.      Count Seven: Unjust Enrichment Claim

Defendants argue that Plaintiffs' unjust enrichment claim should be dismissed because the cause of action is derivative of SDWR and, therefore, constitutes property of the bankruptcy

estate. (Warren Mem. at 13.) Specifically, any benefit conferred to Defendants resulted from the wrongful distribution of property from SDWR, rather than any direct payment from Plaintiffs and, therefore, the trustee has exclusive standing to bring the claim. (Warren Mem. at 13.)

To recover for unjust enrichment in Virginia, a plaintiff must demonstrate that: "(1) [they] conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value." *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008). However, the plaintiff need not *directly* confer the benefit upon the defendant — instead, the plaintiff may merely show that the defendant owned, operated and derived their income from a company that received payment from the plaintiffs. *See Hengle*, 433 F. Supp. 3d at 896 (finding allegations that defendants "owned and operate companies that received a substantial portion of the revenues . . . [that] include[d] payments plausibly made by" plaintiff sufficient to state an unjust enrichment claim); *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 933-34 (E.D. Va. 2019) (finding allegation showing that the defendants "benefitted from [p]laintiffs' payments on their loans because . . . [the defendants] derived income from the enterprise based on borrowers entering into loan [c]ontracts" sufficient to state a plausible unjust enrichment claim). Thus, Plaintiffs would normally have an unjust enrichment claim based on Warren and Dudek indirectly receiving benefits from Plaintiffs through the receipt of income and other revenue from SDWR.

Despite the viability of Plaintiffs' claim on this indirect theory of benefit and injury, this same theory also renders Plaintiffs' unjust enrichment claim property of the bankruptcy estate. Plaintiffs predicate their harms on a legal injury to the estate, namely Warren's and Dudek's improper withdrawals from SDWR of what turned out to be SDWR customers' money, and the

48

laundering of these funds through shell companies and into Warren's, Dudek's and Marianne's

bank accounts. Thus, Plaintiffs' claims do not derive directly from any action by Defendants,

and the harm here cannot be directly traced to Defendants' conduct in removing funds from

SDWR. This claim essentially amounts to a wrongful or fraudulent transfer claim from which no

particularized injury inured to Plaintiffs.

For these reasons, the Court hereby DISMISSES WITHOUT PREJUDICE Plaintiffs'

unjust enrichment claim as to all Defendants.

### H.     Counts Eight and Nine: Individual Unfair and Deceptive Trade Practices Claims

For each of the state law Unfair and Deceptive Trade Practices Claims, Warren and

Dudek repeat their argument that the Court should dismiss these claims, because the individual

Plaintiffs suffered no damages as a result of Defendants' alleged violations of the relevant state

statute. (Warren Mem. at 14-16.) Specifically, they note that because Mrs. Borg and Mrs. Rich

never received a dog, they cannot claim to be harmed by any misrepresentations as to the dogs'

skill or training, because they never had an opportunity to review the accuracy of those

representations. (Warren Mem. at 14-15.) For reasons similar to those already stated, these

arguments fail.

#### *i.     FDUTPA Claim*

To state a claim under the FDUPTA, a plaintiff must allege (1) a deceptive act or unfair

trade practice; (2) causation; and (3) actual damages. *Virgilio v. Ryland Grp., Inc.,* 680 F.3d

1329, 1338 n.25 (11th Cir. 2012) (citing *Rollins, Inc. v. Butland,* 951 So. 2d 860, 869 (Fla. 2d

DCA 2006)). "Deception occurs if there is a representation, omission, or practice that is likely to

mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

*Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1105 (S.D. Fla. 2019) (internal quotations omitted).

Mrs. Borg alleges eight specific misrepresentations that constituted violations of the FDUTPA that primarily include Warren's and Dudek's repeated promises that they never intended to fulfill regarding the training, skills and delivery of the service dogs. As stated, Plaintiffs claim that Dudek and Warren told them that they would receive highly trained service dogs despite knowing "that [these] misrepresentations were untrue when he made them and that there was no basis in fact for any of these misrepresentations." (Compl. ¶ 104.) Thus, Mrs. Borg has alleged a deceptive act by Warren and Dudek — the act of making certain promises about their product — indeed, deliberate lies — without the intention of ever fulfilling them for the express purpose of swindling their customers out of thousands of dollars.

Mrs. Borg claims that these misrepresentations induced her into purchasing one of the dogs. (Compl. ¶ 106.) And, Mrs. Borg did in fact pay substantial amounts of money for a dog because of Warren's and Dudek's lies. "Had Warren and Dudek disclosed to Mrs. Borg that she would not have received a fully trained Service Dog and subsequent training — among other things alleged herein — Mrs. Borg would not have purchased a Service Dog." (Compl. ¶ 285.) Thus, Mrs. Borg has met the causation element of the FDUTPA — the deceptive act of Warren and Dudek — i.e. intentionally making promises without any intention of fulfilling them — caused Mrs. Borg to depart with her money.

And, finally, Mrs. Borg never received a dog, trained or otherwise. Therefore, she suffered easily calculable actual damages — the difference in value between the dog that she paid for (a highly trained service dog) and what she received — nothing. While of course it remains up to Mrs. Borg to supply adequate evidence — circumstantial or otherwise — that

Defendants actually never intended to train the dogs and services at the time that they made these alleged misrepresentations, this presents an issue for trial, given that the Court must take Plaintiffs' allegations as true at this stage of the proceedings. Therefore, the Court DENIES Warren's and Dudek's Motion as to Count Eight.

### ii.    *UCL Claim*

Defendants likewise contend that Plaintiffs' UCL claim must be dismissed for the same reasons that their FDUTPA claim should be dismissed — i.e. that Ms. Rich never received a service dog so she cannot claim harm based on misrepresentation regarding the dog's skill or training. (Warren Mem. at 14-15.) Defendants also add that the contract between SDWR and Ms. Rich "provides that it should be governed and construed according to the laws of Virginia," and that therefore, California's UCL does not apply. (Warren Mem. at 15.)

"To bring a UCL claim, a plaintiff must show either an (1) 'unlawful, unfair, or fraudulent business act or practice,' or (2) 'unfair, deceptive, untrue or misleading advertising.'" *Lippitt v. Raymond James Fin. Servs., Inc.*, 340 F.3d 1033, 1043 (9th Cir. 2003) (quoting Cal. Bus. & Prof. Code § 17200)). To prevail under the "unlawful prong" of the UCL, a plaintiff must show that a challenged advertisement or practice violates any federal law or California law or regulation. *See Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d 871, 835 (Cal. 2013) ("The UCL . . . borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.") (internal quotations omitted). To prevail under the "fraudulent" prong, a plaintiff must "demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." *In re Tobacco II Cases*, 207 P.3d 20, 26 (Cal. 2009).

Therefore, based on the Court's conclusions that Plaintiffs have adequately alleged a federal RICO violation and a claim of common law fraud, Plaintiffs have satisfied their burden as to their UCL claim under both the "unlawful" and "fraud" prongs. Furthermore, Defendants argument that the UCL does not apply here due to the choice of law provision in Ms. Rich's contract carries little weight, given that the challenged actions occurred before the contract's formation. Indeed, Plaintiffs allege that Defendants lied to them to induce them to enter into and pay out on a contract that Defendants had no interest in fulfilling. This cause of action has little to do with the contract itself. For these reasons, the Court also DENIES Warren's and Dudek's Motion as to Count Nine.[3]

## IV. CONCLUSION

In sum, the primary theory of Plaintiffs' case and the injuries that they allege prove much simpler than the parties argue. If Defendants purported to sell fine art, inducing customers to advance thousands of dollars to them with the promise of delivering a masterpiece, only to reveal that the masterpiece never existed, they never intended to procure it and they planned to deliver a fake instead, hoping that customers would not recognize the difference, Defendants' actions would not amount to a simple "breach of contract," and the parties would not attempt to claim that the buyer suffered no injury. Likewise, Plaintiffs clearly suffered injury as a result of Defendants' scheme regardless of whether they received a dog, because they relied on promises that Defendants' never intended to fulfill to Plaintiffs' financial detriment.

---

[3] As noted by Plaintiffs in their Response to Defendants' Motion, Plaintiff Collaros resided in Florida, not Ohio, at all times relevant to her claims against Defendants. Therefore, she abandons her OCSPA claim (Count Eleven) and stipulates to its dismissal. Plaintiffs also state that Denning no longer seeks relief under North Dakota's Deceptive Trade Practices Law (Count Ten), and therefore stipulates to its dismissal as well. Consequently, the Court will not address Defendants' arguments as to Counts Ten and Eleven.

Thus, for the foregoing reasons, the Court hereby GRANTS IN PART AND DENIES IN PART the Motions to Dismiss filed by Defendants (ECF Nos. 11, 17). Specifically, the Court GRANTS Defendants' Motions as to Counts Four, Five, Seven, Ten and Eleven as to all parties. The Court DISMISSES WITH PREJUDICE Count Four, but DISMISSES WITHOUT PREJUDICE Counts Five, Seven, Ten and Eleven. Additionally, the Court GRANTS Defendants' Motion as to Counts One, Two and Three as to Defendants Charitable Occasion and Bordeaux Farms alone and DISMISSES WITHOUT PREJUDICE these claims as to these Defendants. Finally, the Court DENIES Defendants' Motion as to Counts One, Two and Three as to Defendants Warren, Dudek and Marianne Warren, as well as Counts Six, Eight and Nine as to all relevant Defendants.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated: June 28, 2021

53